INGRAM, Appellant, vs. OSBORN, Garnishee, etc., Respondent.

*November 5 — November 22, 1887.*

*Assignment of contract: Agreement to pay creditor from profits: Fraudulent conveyance: Garnishment: Voluntary assignment.*

S. had been awarded a contract to build an ore-dock. Being insolvent he transferred a half interest in the contract to O., who agreed to furnish the bond required and to advance a certain sum to carry on the work.   O. was to have one half of the net profits, and was to devote but one week in each month to the business. It soon became evident, however, that O. must put in more money and devote his whole time to the matter.   The insolvency of S. was a serious embarrassment, and the execution of the contract was liable to be interfered with by proceedings by his creditors, which might bring about a forfeiture of the contract.   S., therefore, assigned all his interest in the contract to O., who agreed to assume all the debts and liabilities arising out of the business, to carry out the contract in the name of S. & Co., to employ S. as superintendent at $200 per month, and if the profits should equal $13,600 to pay $5,000 on a debt of S. to a bank, but if the profits should be less than $13,600

to pay to the bank one half of such profits less the $200 per month paid to S. *Held:*

(1) The assignment of the interest of S. was complete and absolute, and not in fraud of his creditors. The profits realized by O. were, therefore, not subject to garnishment by such creditors other than the bank.

(2) The transaction was not a voluntary assignment for the benefit of creditors, within the meaning of sec. 1694, R. S., or ch. 349, Laws of 1883. *Winner v. Hoyt,* 66 Wis. 227, distinguished.

APPEAL from the Circuit Court for *Eau Claire* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

September 29, 1884, C. C. Smith, the principal defendant herein, entered into a written contract with the Milwaukee, Lake Shore & Western Railway Company, wherein he agreed to perform all the labor and furnish all the materials necessary to fully complete, in the most substantial and workmanlike manner, and to the satisfaction and acceptance of said company's chief engineer, an ore-dock at Ashland, according to specifications annexed, under the direction of the superintendent in charge of the work and said chief engineer, upon (among others) the terms and conditions (1) that such work should be commenced within ten days thereafter and fully completed on or before June 15, 1885, except as to filling with slabs and rock, and the same was to be completed by July 15, 1885; (2) that said superintendent and chief engineer should have full power to reject and condemn all work and materials which, in their opinion, should not conform to the spirit of such agreement, and to decide every question which might or could arise thereunder, and their decision was to be conclusive upon both parties; (3) that the contract was to be performed in such a manner that Smith was not to be relieved from the immediate charge and responsibility of the work, no part of which was to be transferred or sublet to other parties, unless by the sanction of the company; (4) that if any fore-

man or laborer employed by Smith, should, in the opinion of the superintendent, execute his work unfaithfully or unskilfully, or should be remiss, inadequate, disrespectful, or riotous, he might discharge him; (5) that if any damage should be done by Smith or any of his men to any lands adjoining or in the vicinity of such work, the company might pay the same and deduct it from the value of the work; (6) that in doing the work, Smith was not to keep or to suffer to be kept or used any ardent spirits, and was liable to the discharge of his men if he did. It was also agreed therein that the company was to pay as agreed, upon the engineer's certificate of completion of the work; that estimates were to be made during the progress of the work on or about the 1st of each month, and payments made upon the estimate and certificate of the superintendent, approved by the engineer, on the 20th of each month for the amount of such estimate less ten per cent.; that upon such payments being made the title to the property covered thereby was to vest in the company as security for such payments; that Smith execute and deliver to the company a bond in the penal sum of $25,000, with two good and sufficient sureties to be approved by it, conditioned for the full and faithful performance of all the terms, conditions, covenants and agreements contained in the contract; that, if Smith refused or neglected to remedy an imperfection pointed out, or violated any of the conditions of the contract, then in certain contingencies the engineer was empowered to terminate the contract, and the company was thereupon authorized to retain such percentage and recover the full penalty of the bond, or take measures to complete the work and deduct the expense from the contract price; that said chief engineer was thereby made an umpire to decide all matters of dispute between the parties arising or growing out of the contract, and his decision to be final and conclusive.

In taking the contract, Smith's bid was some $30,000 lower than any other, and, being insolvent, he was unable for a time to give the requisite bond.   He thereupon offered a half interest in the contract to the garnishee, *Osborn*, if he would furnish the bond and sureties required, and the means to perform the contract, which he represented would not exceed $5,000.   About November 10, 1884, by verbal agreement *Osborn* accepted such offer, by which he was to have a half interest in the contract and the profits accruing therefrom, and furnish such bond and sureties, which he did, and thereby agreed to put $5,000 into the business, but with the understanding that he was not to devote more than a week in a month to the business.   Smith was then, to the knowledge of *Osborn*, badly embarrassed, insolvent, and practically bankrupt.   December 29, 1884, and after *Osborn* had put $4,800 into the business in pursuance of such agreement, and when it was evident that he would have to put in $3,000 more the next month, and devote his whole time to the business, Smith, by an instrument in writing, with the consent of said sureties and the company, sold, assigned, conveyed, and set over to said *Osborn* all his right, title, and interest in and to said contract, together with all profits which had accrued or might thereafter accrue thereon, together with all contracts made by Smith for timber, rock, materials, tools, and supplies to carry out said contract, together with all such things and supplies then on hand for that purpose, together with all moneys due or to become due from the company thereon, upon the express condition, however, that *Osborn*, by the acceptance thereof, agreed to and did assume and pay all liabilities on Smith's part arising or growing out of said contract with the company and such other contracts, fully and faithfully,— the business of carrying out and completing said contract to be done by *Osborn* in the name of "C. C. Smith & Co."   At the same time *Osborn*, in writing, accepted said assignment

upon the terms and conditions stated, and thereby agreed, in consideration of such consent of the company and said assignment, to fully and faithfully carry out and complete said contract, and to keep and perform all the terms and conditions thereof on the part of said Smith, and also to pay said Smith, for his services as superintendent of the work of such performance of said contract, $200 per month from the commencement of the ore-dock, November 15, 1884, to the time of its completion, and that if the net profits accruing therefrom should equal or exceed $13,600, then to pay to the Batavian Bank of La Crosse $5,000, to be applied on the indebtedness of Smith to said bank; that if said net profits should be less than $13,600, then he agreed to pay said bank one half of the amount of said net profits less the said $200 per month. *Osborn* received from the company on the contract, $177,000, and the net profits he had received thereon amounted to $17,392.14, including the $5,000 paid, and he hoped to get $1,715.55 more. He paid to the bank $2,000, July 27, 1885, and $3,000, September 28, 1885, and the same were indorsed on said agreement.

June 23, 1885, the plaintiff commenced this action by the service of the summons and complaint upon Smith, and the garnishee summons and papers upon *Osborn*. At that time the contract with the company had been performed to within $1,000. The complaint against Smith was upon notes dated March 1, 1884, and in which judgment was entered in favor of the plaintiff for $5,715.40 damages and costs, September 27, 1886. *Osborn*, as garnishee, answered in time, denying any indebtedness or liability as such garnishee. The plaintiff took issue in due form. Upon the trial of the garnishee action, the only evidence consisted of said several writings, the judgment roll against Smith, and the testimony of said garnishee; and thereupon the court found as a conclusion of fact, in effect, that at the time of the service of the garnishee papers on said *Osborn*,

he was not indebted to said Smith in any sum whatever, and had no property or effects in his hands belonging to him or in which he had any interest. And as conclusions of law the court found that said garnishee should have judgment that said garnishee proceedings against him be dismissed, and that he recover of the plaintiff the costs of the action. From the judgment entered thereon the plaintiff appeals.

*Levi M. Vilas,* for the appellant, contended that the assignment to *Osborn* was a fraud upon the creditors of Smith. Smith thereby retained an interest in the profits, without incurring any liability for losses, and was assured a salary of $200 per month for doing what he had before done and continued to do in superintending the work, and everything remained under his control, but beyond the reach of annoying creditors. *Osborn* took with notice of this fraudulent intent, and the assignment was therefore void as to the creditors, even though a valuable and adequate consideration was paid. *Gardinier v. Otis,* 13 Wis. 460; *Avery v. Johann,* 27 id. 246; *Hopkins v. Langton,* 30 id. 379; *Mehlhop v. Pettibone,* 54 id. 652; *Evans v. Rugee,* 57 id. 623; *Chapman v. Ransom,* 44 Iowa, 377; *Jones v. Hetherington,* 45 id. 681; *Darland v. Rosencrans,* 56 id. 122. The assignment and the agreement made at the same time constituted a voluntary assignment by Smith of all his property to *Osborn,* in trust, or for the benefit of the assignor and the Batavian Bank as a preferred creditor; and as such it was void because not executed as required by sec. 1694, R. S., and in violation of sec. 1, ch. 349, Laws of 1883. *Norton v. Kearney,* 10 Wis. 443; *Page v. Smith,* 24 id. 368; *Little Wolf Imp. Co. v. Jackson,* 66 id. 42; *Winner v. Hoyt,* id. 227.

For the respondent there was a brief by *Cameron, Losey & Traer,* and oral argument by *Mr. Losey.* To the point that *Osborn's* agreement with Smith to pay the Batavian

Bank was, at most, nothing more than a preference of a debt by Smith, which he had a right to make, they cited *Ball v. Bowe,* 49 Wis. 498; *Wachter v. Famachon,* 62 id. 123; *Anstedt v. Bentley,* 61 id. 636; *Hoey v. Pierron,* 67 id. 270; *Landauer v. Vietor,* 69 id. 434; and cases cited in opinion by TAYLOR, J., in *Winner v. Hoyt,* 66 Wis. 248.

CASSODAY, J. The plaintiff's indebtedness against Smith, upon which this action was brought, was incurred more than six months before the making of the contract with the railroad company. At the time of making that contract, Smith had no available means and was insolvent, and with no ability to pay his numerous debts. He seems to have had, however, sufficient force of character to secure a contract with the railway company for putting in an ore-dock amounting to nearly $200,000, notwithstanding the fact that he had not the means for carrying it into execution, and was badly in debt. Through his acquaintance with *Osborn,* the latter was induced to furnish the requisite bond and sureties, and agreed to put $5,000 into the business under the parol agreement that he should have one half of the net profits and devote only one week in each month to the business. After having put $4,800 into the business, and after about one month's experience, and before there were any profits in the concern, and when the total estimates had only reached about $9,000, *Osborn* discovered that it would be necessary for him to devote his whole time to the business, and to put $3,000 more into it during the next month, or to subject himself and the sureties on the bond which he had furnished to a forfeiture of the contract and consequent liability for damages upon the contract and bond. Smith was not only powerless to aid in the matter, but his embarrassments, in consequence of his insolvency and prior existing individual indebtedness, subjected the business to additional annoyances by way of

garnishments which might prevent estimates and the payment of men employed, and thus jeopardize the execution of the contract and the liability of the bondsmen without any benefit to any one. All the parties were, under the stringent conditions of the contract in case of any default in its performance, wholly in the hands of the company, which might thereupon terminate the contract and hold the sureties for damages. Smith, realizing the situation, expressed the necessity of his getting rid of the contract, or he would, in the manner indicated, be deprived of anything to live on, as in case of garnishment there would necessarily be a stoppage of payment. In view of the whole situation, it was agreed, with the consent of the company and the sureties, that Smith should sell and assign all his right, title, and interest in the contract, tools, and materials on hand to *Osborn*, who agreed to assume and pay all debts of the concern, carry out and execute the contract in the name of C. C. Smith & Co., employ Smith to superintend the same at $200 per month, and in case the net profits of the job reached the figures named, or less, then he was to pay on Smith's prior indebtedness to the bank one of the sums named. All this was done and the papers executed, December 29, 1884.

The case must turn upon the validity of that transaction. There is no pretense that the plaintiff's debt was among those assumed by *Osborn*, or in any way connected with the business. There is no evidence that the tools and materials on hand at the time of the sale and assignment to *Osborn* exceeded in value the indebtedness then assumed by him. There is no evidence that Smith's services were not worth all that he was to receive per month. In the absence of such evidence, we must assume that the skill and ability essential to superintend such a job was worth as much per month as he was to receive. Considerable more money or good financial credit was requisite in order to secure any-

thing from the contract, and confessedly Smith had neither. In what way, then, were Smith's individual creditors, including the plaintiff, to be injured by the transfer? The whole thing was a venture. There was, indeed, a possibility, and we may assume a probability, of securing prospective profits from it. But such profits could only be secured by putting in more money and performing the contract. Smith could not put in any money, and did nothing in performing the contract, except as an employee. *Osborn* assumed the whole responsibility, did put in more money, and did perform the contract, and thereby secured the net profits.

Of course, had the assignment been made with the intent to hinder, delay, or defraud creditors, it would have been void as to creditors. But we find no evidence of such intent. It appears, even, from one of the cases cited by the learned counsel for plaintiff, that the mere fact that *Osborn* purchased with knowledge of Smith's insolvency was not evidence that such transfer was made with the intent to defraud creditors. *Darland v. Rosencrans*, 56 Iowa, 122. It is much stronger in favor of the garnishee than it would have been had Smith retained the contract himself and then sold and assigned the future profits under it. And yet it has been held that such a sale and assignment is operative and valid in equity when fairly made, and not opposed to any rule of law or public policy. *Field v. Mayor*, 6 N. Y. 179, 57 Am. Dec. 435, and note; *Mulhall v. Quinn*, 1 Gray, 105, 61 Am. Dec. 414. And in a recent case it has been held that such an assignment of wages to be subsequently earned is good even as against the creditors of such assignor. *Lewis v. Lougee*, 63 N. H. 287. Where an interest in prospective profits is reserved by the debtor, it may be subject to garnishment after it has actually accrued and become payable to him, but not before. *Foster v. Singer*, 69 Wis. 392. But here the debtor absolutely disposed of all his

right, title, and interest in and to the whole contract. He retained nothing but mere employment at fair wages, which he made no attempt to dispose of. There is nothing to indicate that any portion of such profits were to be secured or held by *Osborn* for the benefit of Smith. The transfer was intended by both *Osborn* and Smith to be complete and absolute. True, in consideration of the sale and assignment, *Osborn* was to make a payment to the bank — a creditor of Smith's,— the amount of which was to depend upon whether the net profits should be above or below a certain figure named. But that was not for the benefit of Smith, but for the benefit of one of his creditors. True, it was a cancellation of one of Smith's debts to the amount of such payment, but it would be a solecism to say that it operated, or could operate, as a fraud upon any of Smith's creditors. The agreement to make such a payment was obligatory upon *Osborn* from the moment it was entered into, and was enforceable by the bank as soon as such profits accrued. *Wynn v. Carter*, 20 Wis. 107; *Putney v. Farnham*, 27 Wis. 187; *Johannes v. Phenix Ins. Co.* 66 Wis. 57.

The only remaining question is whether the transaction was void as securing a preference to one of Smith's creditors over others? At the time of that transaction, preferences were only forbidden when given by an " assignment " " made for the benefit of creditors," or in transfers by the debtor made within sixty days prior to the making of such an " assignment " by him. Ch. 349, Laws of 1883. Here there was no assignment " for the benefit of creditors," unless the sale and transfer of the contract with the railway company is to be regarded as such an assignment. If that is to be regarded as a voluntary assignment " for the benefit of creditors," then it was also void for the further reason that it was not accompanied by the bond and other conditions required in the making of such assignments. Secs. 1694–1696, R. S. The statute expressly declares that "all

voluntary assignments or transfers whatever . . . *for the benefit of or in trust for creditors* shall be void as against the creditors of the person making the same, unless " such bond is given and such other conditions complied with. Sec. 1694. There can be no question but what the "assignments " mentioned in ch. 349, Laws of 1883, refers to the same class of "assignments or transfers " thus mentioned in the statutes. The whole question, therefore, resolves itself into this: Was the transaction in question a voluntary assignment or transfer "for the benefit of or in trust for creditors," within the meaning of the statute?

It is claimed that this is such an assignment, within the decision of *Winner v. Hoyt*, 66 Wis. 227. In that case, the debtors transferred *all* their property not exempt by means of six chattel mortgages and five assignments running to five different creditors, and all given at substantially the same time, in pursuance of the same agreement, for the same common purpose, and in relation to the same subject matter, with the understanding and intent that *one* of such creditors, *for himself and as agent and trustee for the others*, should take immediate possession, which he did, and then convert the same into money and divide the same *pro rata* among such favored creditors. The court simply held that such eleven written instruments, given under such circumstances and for such a purpose and with such an understanding and intent, would be construed together as one instrument in law, and that when so construed they were in legal effect a voluntary assignment or transfer of all the property of the debtors not exempt " for the benefit of or in trust for creditors," within the meaning of the statute. Certainly they transferred all the property of the debtors. Certainly all of such property was taken by one of such creditors, for himself and as agent and trustee for the others, with the intent of all the parties that he should convert such property into money and then divide the same

*pro rata* among such favored creditors. The mere fact that he was a creditor as well as such agent and trustee did not deprive the transaction of its trust feature thus imposed for the benefit of such other creditors. If that was not an assignment for the benefit of or in trust for creditors within the meaning of the statute, then there can be no such assignment or transfer unless made in the precise manner prescribed by the statute. But that would be the complete subversion of this statute, which clearly contemplates other ways of making "voluntary assignments or transfers . . . for the benefit of or in trust for creditors," than thus prescribed, and then declares that if one is made in any such other way it "shall be void as against the creditors of the person making the same." This distinction was maintained in *Landauer v. Victor*, 69 Wis. 434.

Thus, also, in *Lucas v. Sunbury & E. R. Co.* 32 Pa. St. 464, it was said by the court: "We have here property, a trustee, a trust, and creditors of an insolvent company, who are to take under it; and the simple question is whether, by an ambiguous inversion of language, the real meaning of this instrument can be so covered as to defeat the operation of a most salutary law;" and then the court held the instrument to be a voluntary assignment in trust for some of the creditors of the assignors. See *Lookout Bank v. Noe*, 5 S. W. Rep. (Tenn.), 433. According to Burrill, "voluntary assignments for the benefit of creditors are transfers, without compulsion of law, by debtors, of some or all of their property to *an assignee or assignees, in trust*, to apply the same or the proceeds thereof to the payment of some or all of their debts, and to *return the surplus, if any, to the debtor.*" Burrill, Assignm. § 2; *Wiener v. Davis*, 18 Pa. St. 333. Where the assignment is by way of security only, such trust is implied from the nature of the security as to any surplus that may remain. Burrill, Assignm. § 3. There must be a trust, a trustee, creditors, and *cestui que trust*, who can compel an

enforcement of the trust, in order to constitute an assignment for the benefit of or in trust for creditors.   Bish. Insolv. § 130.   *Dickson v. Rawson*, 5 Ohio St. 222.   "Where the assignment is to a single creditor, or to a few selected creditors, and is made *absolutely* and by way of full *payment* or *satisfaction*, it is, of course, wholly divested of the character of a trust, and is in the nature of an ordinary conveyance or sale for a valuable consideration."   Burrill, Assignm. § 3.

Here, in our judgment, the sale and transfer to *Osborn* was absolute and unconditional in consideration of the full or partial payment and satisfaction of a debt actually due to the bank from Smith, unaccompanied by any trust in favor of Smith or any of his creditors.   It follows that the transaction in question was not an assignment or transfer for the benefit of creditors, within the meaning of the statute.

At the time the garnishee papers were served upon *Osborn*, he had paid Smith about $100 more than was due him for wages.

*By the Court.*— The judgment of the circuit court is affirmed.